02-11-374-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00374-CV

 

 

 


 
 
 In the Interest of N.B.B.C.
 and J.A.A.J., Children
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

 

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

          Appellant
D.J. (Mother) appeals the termination of her parental rights to her children
N.B.B.C. (“Nicolas”) and J.A.A.J. (“Jane”).[2] 
We will affirm the trial court’s judgment.

Background
Facts

          Mother
first became involved with Child Protective Services (CPS) in 2004, when she
was using methamphetamine while caring for her oldest child.[3] 
The child was taken from Mother and placed with Mother’s mother (Grandmother). 
In 2005, while Mother was pregnant with Nicolas, she was committed to a
psychiatric hospital, where she testified she received antidepressants and
antipsychotics.  When Nicolas was born, he tested positive for barbiturates and
tricyclics.  Nicolas was also placed with Grandmother.  At some point, Mother
took Nicolas back.  He was in her care in late 2006 when Mother tested positive
for methamphetamine.  CPS took Nicolas and placed him with a foster family,
where he remained for about nine months.

In
late 2006 or early 2007, Mother, who was two months pregnant with Jane, was
arrested for unauthorized use of a motor vehicle.  She received probation for
three years.  Mother testified that after Nicolas was removed she worked on her
substance-abuse issues for twenty-four months.  When she was seven months
pregnant with Jane, Mother voluntarily checked herself into a thirty-day
inpatient rehab program “to get [Nicolas] back and to keep them from
terminating” her rights to Jane.  CPS returned Nicolas to Mother in 2008, did
not seek to take custody of Jane, and closed its case.

In
August 2009, CPS was notified by Mother’s probation officer that she had failed
four court-ordered drug tests in a row, testing positive for methamphetamines. 
CPS filed its “Petition for Protection of Children, For Conservatorship, and
for Termination in Suit Affecting Parent-Child Relationship” on September 14,
2009.  Temporary orders were entered on October 16, 2009, appointing CPS as
temporary managing conservator of the children.  Mother’s probation was revoked
and she was incarcerated in state jail for nine months.  While in jail, Mother
completed “all kinds” of programs.  In February 2011, after Mother was
released, CPS moved for, and the trial court granted, monitored return of the
children.  In June, a hair follicle drug test returned positive for
methamphetamine and amphetamine.  CPS took the children back into care and pursued
termination of Mother’s parental rights as well as termination of the rights of
the alleged biological fathers and any unknown fathers.[4]

          After
a trial to the bench, the trial court found that Mother had knowingly placed or
knowingly allowed her children to remain in conditions or surroundings that endangered
the physical or emotional well-being of the children; engaged in conduct or
knowingly placed the children with persons who engaged in conduct that endangered
the physical or emotional well-being of the children; and that termination of
Mother’s parental rights was in the children’s best interest.[5] 
This appeal followed.

Standard
of Review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  In a termination
case, the State seeks not just to limit parental rights but to erase them
permanently—to divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child’s right
to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick v.
Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at 20–21; In re R.R., 294 S.W.3d
213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re
J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625, 629 (Tex.
App.—Fort Worth 2000, pet. denied).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also id. §
161.206(a) (West 2008).  Evidence is clear and convincing if it “will produce
in the mind of the trier of fact a firm belief or conviction as to the truth of
the allegations sought to be established.”  Id. § 101.007 (West
2008).  Due process demands this heightened standard because termination
results in permanent, irrevocable changes for the parent and child.  In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243
S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated subsections (D) and (E) of section 161.001(1) and that
the termination of the parent-child relationship would be in the best interest
of the child.  Tex. Fam. Code Ann. § 161.001; In re C.H., 89 S.W.3d
17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence
that a reasonable factfinder could not have credited in favor of the finding is
so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.

Discussion

I.  Grounds
for termination

In
Mother’s first and second issues, she challenges the legal and factual
sufficiency of the evidence to support the trial court’s findings under
subsections (D) and (E) of section 161.001(1) of the family code.  Since the
evidence pertaining to subsections 161.001(D) and (E) is so interrelated, we
will consolidate our review.  In re S.D., 980 S.W.2d 758, 762 (Tex. App.—San
Antonio 1998, pet. denied); In re B.R., 822 S.W.2d 103, 106 (Tex.
App.—Tyler 1991, writ denied) (recognizing the link between a parent’s conduct
and a child’s conditions and surroundings).

“Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth
2003, no pet.).  Under subsection (D), it is necessary to examine evidence
related to the environment of the children to determine if the environment was
the source of endangerment to the children’s physical or emotional well-being.  J.T.G.,
121 S.W.3d at 125.  Conduct of a parent in the home can create an environment
that endangers the physical and emotional well-being of a child.  In re W.S.,
899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  For example, abusive
or violent conduct by a parent or other resident of a child’s home may produce
an environment that endangers the physical or emotional well-being of a child.  See
id. at 776–77; Ziegler v. Tarrant Cnty. Child Welfare Unit, 680
S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref’d n.r.e.).  Parental and
caregiver illegal drug use and drug-related criminal activity likewise supports
the conclusion that the children’s surroundings endanger their physical or
emotional well-being.  See S.D., 980 S.W.2d at 763.

Under
(E), the relevant inquiry is whether evidence exists that the endangerment of
the children’s physical well-being was the direct result of the parent’s
conduct, including acts, omissions, or failures to act.  See J.T.G., 121
S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E). 
Additionally, termination under (E) must be based on more than a single act or
omission; the statute requires a voluntary, deliberate, and conscious course of
conduct by the parent.  J.T.G., 121 S.W.3d at 125; see Tex. Fam.
Code Ann. § 161.001(1)(E).  It is not necessary, however, that the parent’s
conduct be directed at the children or that the children actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The
specific danger to the children’s well-being may be inferred from parental
misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children’s birth.  In re D.M., 58
S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Mother
argues that she had done much to comply with her service plan, such as
obtaining stable housing.  However, Mother testified that by the time of trial,
she no longer had stable housing and did not know where she would take her
children that night if they were returned to her.  See In re T.S., No. 02-10-00089-CV,
2010 WL 4486332, at *8 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.)
(upholding finding of endangerment when father was, among other things, unable
to provide stable housing and financially unable to care for his children).  She
admitted, “I have no way to take care of them and nowhere to take them.”  She
was unemployed with little prospect for employment.  She had dropped out of
high school and had a felony conviction.  She had no transportation and was
staying with friends.  She testified further that she did not know what school
Nicolas would attend if the children were returned to her.  When asked whether
she believed that she could provide a safe environment for the children, she
said, “After all this stuff y’all have said, I don’t think I can.”  When asked
about her plans to secure a job and transportation, she testified, “Really,
right this second, I don’t know.  I’ve kind of been waiting on this to see what
I’m going to do.”

She
admitted that she used drugs while the children were in her custody, but denied
using drugs in their presence.  She admitted that using drugs while having
custody of her children was not a good parenting decision.  Mother’s probation
officer, Krystal Henson, testified that Mother failed six drug tests from
August through December 2009.  Mother also admitted twice in August 2009, that
she had done drugs.  Henson testified that when she was transferred to Mother’s
case in July 2009, Mother missed three drug tests.  Henson testified that
missing drug tests is an indication that the person is doing drugs again. 
Henson directed Mother to attend an intensive day treatment program.  When
Mother failed to go, a motion to revoke probation was filed.

Henson
testified that she did not think Mother took her probation seriously, pointing
to the fact that Mother missed drug tests and appointments with her probation
officer.  Henson also testified that Mother had given the wrong address for her
apartment building.  When Henson questioned Mother about it, Mother asked
Henson to write down Mother’s address for her.  Henson confirmed that her
concern that Mother was unable to care for her children was the reason that she
had called CPS.

Mother
was unable to get the children to daycare on time (even though it was within
walking distance), often arriving two hours late.  During the monitored return,
Mother’s CPS caseworker, Ashley Brooks, testified that Nicolas told her he had
trouble waking Mother up in the morning.  Brooks spoke to Mother about getting
the children to school on time.  Mother improved for a time, but reverted to
being late.

Mother
testified at trial that during the summer of 2011, she felt she was “on the
verge of a relapse” and called her therapist, who suggested she call MHMR and
get back on antidepressants.  Claiming that she had not liked the way the drugs
affected her, she put off getting help.  Mother decided that she had “already
kind of screwed up” and, thinking that she was going to lose her children,
started keeping the children out of daycare to spend time with them.[6] 
Mother admitted that she did not pursue help for her mental state “like they
wanted me to.”  She also acknowledged that she knew CPS was requiring sobriety
as a condition of the return of her children, but that she did not want to go
into drug treatment.

Mother’s
history with drug abuse goes back at least seven years.  Although Mother argues
that she has been drug free for the past five months, she has claimed a number
of periods of sobriety only to relapse.  Although Mother acknowledges her
responsibility for her actions, it appears that she has yet to overcome her
addiction.  The trial court could have believed that there was a serious
concern that Mother would relapse back into drug addiction.  See In re J.D.B.,
No. 02-06-00451-CV, 2007 WL 2216612, at *3 (Tex. App.—Fort Worth Aug. 2, 2007,
no pet.) (mem. op.) (noting that a factfinder may infer that past conduct
endangering the well-being of a child may recur in the future if the child is
returned to the parent); In re C.S.C., No. 02-06-00254-CV, 2006 WL
3438185, at *7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (same).

When
Brooks questioned Mother about her failed drug test in June 2011, Mother
repeatedly denied any drug use and told Brooks that she heard “you can have sex
with somebody and then test positive that way.”  Mother admitted that she did
not tell CPS that she was sometimes living with a friend (“Joe,” one of the men
Mother listed as the possible father of Jane) because she did not want CPS to
require him to work services because she believed he was not willing to
participate.  She acknowledged that it would have been helpful to have Joe
demonstrate his ability to care for Jane, but “he is not capable of it.”

When
CPS arrived at Mother’s house to remove the children in June 2011, a man was in
the apartment.  Brooks asked who he was, but Mother instructed him not to
respond.  Mother told Brooks that her electricity was out so she had sent the
kids to her aunt’s apartment, despite knowing that her aunt did not have
permission to watch the children while Mother had the children on a monitored
return.  When CPS retrieved the children, Brooks said they were a little
dirty.  The foster mother also testified that the children were dirty and that
they smelled of body odor.

Mother
argues that there is no single specific act or omission that endangered her
children.  However, drug use and its effect on a parent’s life and her ability
to parent may establish an endangering course of conduct.  R.W., 129
S.W.3d at 739.  Likewise, evidence of criminal conduct, convictions, and
imprisonment will support a finding that a parent engaged in a course of conduct
that endangered the child’s well-being.  J.T.G., 121 S.W.3d at 133. 
While imprisonment alone does not constitute a continuing course of conduct
that endangers the physical or emotional well-being of a child, it is a fact
properly considered on the issue of endangerment.  Boyd, 727 S.W.2d at
533–34.

The
evidence is that Mother has battled drug addiction for at least seven years,
and her inability to stay off methamphetamine supports a finding of
endangerment.  See J.T.G., 121 S.W.3d at 125 (noting that
parental drug use supports the conclusion that the children’s surroundings
endanger their physical or emotional well-being); see also In re K.W.,
No. 02-09-00041-CV, 2010 WL 144394, at *7–8 (Tex. App.—Fort Worth Jan. 14,
2010, no pet.) (mem. op.) (holding that mother’s drug use supported
endangerment finding); In re Z.D., No. 02-07-00386-CV, 2008 WL 4354936,
at *7 (Tex. App.—Fort Worth Sept. 25, 2008, no pet.) (mem. op.) (“A parent’s
engaging in illegal drug activity after agreeing not to do so in a service plan
for reunification with her children is sufficient to establish clear and
convincing proof of voluntary, deliberate, and conscious conduct that
endangered the well-being of her children.”).

The
clear and convincing evidence supports the trial court’s finding that the environment
provided for the children under Mother’s care endangered the physical or
emotional well-being of her children.  Further, the clear and convincing
evidence supports the trial court’s finding that Mother engaged in a course of
conduct that endangered her children.  Accordingly, we hold that the evidence
is both legally and factually sufficient to support the trial court’s
termination findings under subsections 161.001(D) and (E).  We overrule Mother’s
first and second issues.

II.  The
best interest finding

In
Mother’s third issue, she challenges the trial court’s finding that termination
of her parental rights was in her children’s best interest.  There is a strong
presumption that keeping a child with a parent is in the child’s best interest. 
In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent
placement of the child in a safe environment is also presumed to be in the
child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  The
following factors should be considered in evaluating the parent’s willingness
and ability to provide the child with a safe environment:

(1)     the child’s age and physical and mental
vulnerabilities;

(2)     the frequency and nature of out-of-home
placements;

(3)     the magnitude, frequency, and circumstances of
the harm to the child;

(4)     whether the child has been the victim of repeated
harm after the initial report and intervention by the department or other
agency;

(5)     whether the child is fearful of living in or
returning to the child’s home;

(6)     the results of psychiatric, psychological, or
developmental evaluations of the child, the child’s parents, other family
members, or others who have access to the child’s home;

(7)     whether there is a history of abusive or
assaultive conduct by the child’s family or others who have access to the child’s
home;

(8)     whether there is a history of substance abuse by
the child’s family or others who have access to the child’s home;

(9)     whether the perpetrator of the harm to the child
is identified;

(10)    the willingness and ability of the child’s family
to seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency’s close supervision;

(11)    the willingness and ability of the child’s family
to effect positive environmental and personal changes within a reasonable
period of time;

(12)    whether the child’s family demonstrates adequate
parenting skills, including providing the child and other children under the
family’s care with:

(A)   minimally adequate health and nutritional care;

(B)   care, nurturance, and appropriate discipline
consistent with the child’s physical and psychological development;

(C)  guidance and supervision consistent with the child’s
safety;

(D)  a safe physical home environment;

(E)   protection from repeated exposure to violence even
though the violence may not be directed at the child; and

(F)   an understanding of the child’s needs and
capabilities; and

(13)    whether an adequate social support system
consisting of an extended family and friends is available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of the
individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home or
proposed placement;

(H)     the acts or omissions of the
parent which may indicate that the existing parent-child relationship is not a
proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

          At
the time of trial, Nicolas was almost six and Jane was four.  Nicolas has been
in foster care twice since he was about a year old.  The first time, he was in
care for nine months.  He went back into foster care when he was three years
old and remained there for about a year.  Jane has been in foster care since
she was two years old.  See Tex. Fam. Code Ann. § 263.307(b)(1)–(2).

          Mother
admits that she has a drug problem.  In the past seven years, Mother claims she
had maintained sobriety once for twenty-four months, before Jane was born, and
once for five months, from April 2011, until trial.  See id. § 263.307(b)(3)–(4).
 Mother
has relapsed into drug addiction repeatedly after her first encounters with CPS
and has repeatedly refused drug treatment.  Mother admitted that her drug
problems have made it hard for her to care for her children.

          Mother
has left her children with Grandmother, with whom she admits she has done
drugs.  See id. § 263.307(b)(8).  When
she failed the drug test in June 2011, Mother told her caseworker that she
thought the positive result was from sleeping with someone with drugs in their
system.  Aside from not acknowledging her own drug use, this statement raises
concerns that she continues to associate with drug users.

The
foster mother testified that Jane made an outcry of sexual abuse and identified
Joe as the perpetrator.  See id. § 263.307(b)(9).  The
foster mother also testified that Jane had told Mother and that Mother had done
nothing to limit Joe’s access to Jane.  At trial, Mother expressed surprise
that Jane had made an outcry.

Mother
made appointments with counselors but failed to show.  See
id.
§ 263.307(b)(10). 
Mother
testified that she no longer had a sponsor in NA because she did not “feel
comfortable talking to her after a while.”  She testified that she similarly
had difficultly talking to her counselors because she “get[s] kind of freaked
out.”  She also testified that she has not completed any of the twelve steps.

Mother
missed drug tests and appointments with her probation officer.  See id. §
263.307(b)(11). 
She
failed six drug tests within a five month period.  Mother admitted that she put
off seeking medical intervention for her depression.  Mother told Brooks that
she did not want to go to drug treatment “until she could commit to it,” and
even after the children were removed for the final time, she was not ready to
commit.  Mother testified that she did not go into drug treatment at that time
“because [she] wasn’t worried about it.”  Brooks testified that she does not
believe Mother has made it to the point where she can be considered sober and
drug free.

Brooks
testified that Mother did appear to take care of the children’s basic needs
such as food, medical needs, and beds.  See id. § 263.307(b)(12). 
She
also testified that the house was not filthy, but a little messy.  Brooks
testified that Mother appeared to be a loving and caring mother, but that
sometimes she was unable to follow through.

Mother
testified that she did not have any friends or family to help her with
transportation or finances.  See id. § 263.307(b)(13).  Although
she had worked for her godfather in the past, he did not offer her another position
because they “butt[ed] heads.”  Her stepfather had paid for her apartment, but
he no longer does so.  There was no testimony that he would pay for another
apartment if the children were returned.

Mother
acknowledged in her testimony that CPS and the trial court had given her
numerous opportunities.  CPS returned Nicolas to her after Jane was born, and
both children were returned after she was released from state jail. 
Nevertheless, she has proven that she cannot put the best interests of her
children ahead of her issues and problems.  At trial, Mother was asked,

Q.    And you’ve kind
of brought yourself up to this position; is that right?

 

A.    Of course,
yeah.

 

Q.    You just want
to be given the opportunity to fix this, right?

 

A.    Yeah, pretty
much.

 

Q.    Okay.

 

A.    And I
understand if it’s not fixable, you know.  Like, I get that and everything. 
But I can’t just walk away from my kids, you know.  I’d rather y’all, like,
slap me in the face with termination than me just sign them over.

Brooks
testified that she believed it was in the children’s best interest to terminate
Mother’s parental rights.  She said that the children are “pretty happy kids
now” and have adjusted well to their foster family.  Brooks believes that the
foster family is a good placement for the children.  The foster mother
testified that she and her husband wanted to adopt the children and said, “We
love these kids and we would love to keep them with us.”

Giving
due consideration to evidence that the trial court could have found to be clear
and convincing, and based on our review of the entire record, we hold that a
reasonable trier of fact could have formed a firm belief or conviction that the
termination of Mother’s parental rights would be in the children’s best
interests.  Accordingly, we hold that there was sufficient evidence to support
the trial court’s best-interest finding.  We overrule Mother’s third issue.

Conclusion

          Having
overruled all of Mother’s issues, we affirm the judgment of the trial court.

 

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and GABRIEL, JJ.

 

DELIVERED:  January 12, 2012









[1]See Tex. R. App. P. 47.4.





[2]We use aliases for the
children throughout this opinion.  See Tex. R. App. P. 9.8(b)(2).





[3]Mother’s oldest child was
not the subject of this case, and Mother retains joint custody of him.





[4]The trial court terminated
the rights of the purported fathers of the children after trial.  The fathers
are not parties to this appeal.





[5]See Tex. Fam. Code
Ann. § 161.001 (West Supp. 2011).





[6]CPS paid for protective
child care for the children from 9:00 a.m. to 3:00 p.m. each weekday while
the children were on monitored return to Mother.  The daycare also served as a
Pre-K school for Nicolas.